Elaine THOMAS et al., Plaintiffs,

v.

FAG BEARINGS CORPORATION, Defendant and Third–Party Plaintiff,

v.

CONTRACT FREIGHTERS, INC., et al., Third–Party Defendants.

No. 92–5070–CV–SW–8.

United States District Court, W.D. Missouri, W.D.

Feb. 10, 1994.

---

6. The court has already ruled that plaintiff may not seek damages on his wife's behalf.

1384

Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, James T. Price, Elaine Drodge Koch, Spencer, Fane, Britt & Browne, Randall E. Hendricks, Rouse, Hendricks, German, May & Shank, P.C., Kansas City, MO, Carol M. Wood, King & Spalding, Atlanta, GA, James W. Erwin, Gordon L. Ankney, Thompson & Mitchell, St. Louis, MO, James H. Arneson, Gary R. Cunningham, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, MO, for third-party defendants.

## MEMORANDUM OPINION AND ORDER

STEVENS, Chief Judge.

This matter is before the Court on third-party defendants' motions for summary judgment. This suit began as a class-action complaint by the residents of Silver Creek and Saginaw Village against FAG Bearings Corporation for the contamination of their well water by the chemical TCE, which they allege was released into the groundwater by FAG Bearings. FAG Bearings, in turn, brought a third-party complaint against numerous other corporations which maintain facilities near Silver Creek and Saginaw Village.

Those third-party defendants now move for summary judgment on the grounds that FAG Bearings cannot prove that any one of them caused the contamination at Saginaw Village or Silver Creek.

John M. Parisi, Bobbie R. Bailey, Lynn R. Johnson, Shamberg, Johnson, Bergman & Morris, Chartered, Overland Park, KS, Michael A. Gould, Raaji Deen Kanan, Gould & Duchardt, North Kansas City, MO, for plaintiffs.

David Field Oliver, Smith, Gill, Fisher & Butts, Kansas City, MO, Eric S. Aronson, John M. Scagnelli, Whitman & Ransom, Newark, NJ, for defendant and third-party plaintiff.

William T. Session, The Session Law Firm, John M. Edgar, Bryan Cave, Kansas City, MO, David R. Erickson, Douglas P. McLeod,

### SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ If a party is unable to make a sufficient showing to establish the existence of some essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■■■ A party seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the nonmoving party's case is lacking. *Id.* The burden then shifts to the nonmoving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is not currently available. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e). If the nonmoving party fails so to respond, summary judgment, if appropriate, shall be entered against that party. Fed.R.Civ.P. 56(e).

■■■ The standard for determining whether a factual dispute is genuine is the same as the standard applied to motions for a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2511.

> The "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, [461 U.S. 731] 103 S.Ct. 2161 [76 L.Ed.2d 277] (1983).

*Id.*, 477 U.S. at 251, 106 S.Ct. at 2512. The standard under both is whether the evidence is sufficiently at odds as to require a jury to decide, or whether the case is so one-sided that one party must prevail as a matter of law. *Id.*

> If [a party] in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict.

*Id.* at 252, 106 S.Ct. at 2512. Therefore, the standard on this motion is whether the defendant has come forward with evidence which would allow a reasonable jury to find in its favor.

The facts must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences which may be made from the facts disclosed in the record. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Raschick v. Prudent Supply, Inc.*, 830 F.2d 1497, 1499 (8th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

In applying the Supreme Court's standard for summary judgment, this Court is guided by the following language from *Celotex Corp. v. Catrett*:

> One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose....
>
> The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims or defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing those claims and defenses to demonstrate in the manner provided by the Rule, prior to trial,

that the claims and defenses have no factual basis.

477 U.S. at 323–27, 106 S.Ct. at 2553–55.

## DISCUSSION

FAG Bearings brought this third-party complaint against the third-party defendants under CERCLA, 42 U.S.C. § 9613 for indemnity or contribution towards satisfaction, if any, of liability assessed to FAG Bearings for contamination at the Silver Creek and Saginaw Village sites.[1] FAG Bearings also sued the third-party defendants for the contamination of its own site under 42 U.S.C. § 9607. The elements to prove either claim are essentially the same. Proof of a CERCLA claim requires that:

1. There was a release or threatened release of a hazardous substance;

2. The site of the release or threatened release is a "facility" as that term is defined in the statute;

3. The release or threatened release has caused a party to incur response costs; and

4. The person from whom costs are sought falls into a statutorily-defined group of persons.

*See* 42 U.S.C. § 9607.

Under Rule 56, the defendant must not disprove every element and every possible factual scenario. The defendant need only make a showing that plaintiff cannot prove an element of its case. Once that is done, the burden is on the plaintiff to present some evidence that there is a material issue of fact about the element in question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In this case, the third-party defendants argue that FAG Bearings cannot prove numbers one or three of the stated essential elements of a CERCLA claim. The third-party defendants claim that FAG Bearings can present no evidence that there has been a "release"

of TCE or any TCE-related substance at any of the third-party sites. They further argue that FAG Bearings has no evidence to support a contention that any release at their site "caused" the contamination at Silver Creek or Saginaw Village.

Both issues raised by third-party defendants relate directly to the concept of "causation" in CERCLA actions. Before addressing either argument, the Court must discern the role of causation under 42 U.S.C. § 9607.

 The element of "causation" in CERCLA suits has rarely been addressed because the "release" of the hazardous waste is almost always at the same site that has been contaminated. Congress adopted strict liability in these situations.[2] It is not necessary to connect the actual waste disposed of at a site to the waste actually released. Instead, Courts have determined that the statute

appears to impose liability on a generator who has (1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator (3) if there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs.

*United States v. Wade*, 577 F.Supp. 1326, 1333 (E.D.Pa.1983); *see also* William W. Rodgers, Jr., 4 *Environmental Law—Hazardous Wastes and Substances* § 8.11, at 661. There is no need to trace the wastes released to the wastes deposited, or to show that defendant's delivery of wastes to the site was the "but for" cause of the release, or that defendant's wastes were a substantial factor in the resulting contamination. *See* Rodgers, § 8.11, at 611–612. The connection is presumed. One whose waste is disposed of at a site is presumed to be jointly and severally liable for the entire contamination at a site. This is so in the overwhelming majority of cases.

---

1. FAG Bearings also asserts various common law claims. Since those claims carry the common element of causation, which is central to the Court's consideration of the CERCLA claim, they will not be addressed separately.

2. Congress intentionally removed statutory language on causation from the final bill that would have required a causal nexus between defendant's acts and actual contamination. *Dedham II*, 889 F.2d 1146, 1153 (1st Cir.1989); H.R.Rep. No. 1016, 96th Cong.2d Sess. 33 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6136–6137.

The present case, however, is in a different posture. This is a "two-site" case—the alleged release took place at a different site than where the contamination was found. Use of the strict liability presumption of *Wade* without modification would hold liable anyone who released the same type of substance that has contaminated another site. A party who discovers TCE groundwater contamination in Missouri could successfully sue every party who released TCE in the entire country. Although CERCLA's liability provisions are far-reaching, there is no indication that Congress intended this absurd result. Accordingly, the Court must determine what type of link CERCLA requires between an offsite release and the resulting contamination.

The Eighth Circuit recently touched upon the causation issue in *Farmland Indus. Inc. v. Morrison–Quirk Grain Corp.*, 987 F.2d 1335 (8th Cir.1993). In that case, the defendant was sued under CERCLA for contributing to contamination at a site. The defendant admitted that a release had occurred many years previous, but that the release had been cleaned up. Defendant argued that a causal link between the contamination and the harm was necessary under the existing facts. The Eighth Circuit agreed and held that there must be a causal link between the contamination and the response costs incurred in cleaning it up. To hold otherwise would mean that the scope of liability for any contamination that migrated to a site would be unlimited.

Although *Morrison–Quirk Grain* did recognize the principle of causation, it did not address the application of causation principles and the standard of proof in a multiple site situation.

Third-party defendants in the present case argue that causation should be strictly defined and that it should be interpreted to require FAG Bearings to be able to trace the contamination at Silver Creek and Saginaw Village directly to a third-party defendant. FAG Bearings argues that the statute's adoption of strict liability relieves it of the

need to "fingerprint" the contaminants, and that a looser showing of causation should be allowed.

While cases dealing with multiple-site causation are rare, there are two published ones that deal with substantially similar issues.[3] An in-depth look at those cases would be helpful in framing the causation issues before the Court in this case.

### Dedham Water Co. v. Cumberland Farms

This case involves Dedham Water Co. (Dedham) wells that were contaminated by volatile organic compounds (VOCs). Dedham cleaned up the contaminated wells and later sued nearby Cumberland Farms, alleging that VOCs discharged from Cumberland's property contaminated the groundwater at Dedham's wells. The case resulted in several published opinions from both the district and circuit courts.

The district court was confronted on a summary judgment motion with the issue of whether plaintiff must prove that defendant in fact caused the contamination at plaintiff's site, where defendant's alleged release did not occur on plaintiff's property. *Dedham I*, 689 F.Supp. 1223 (D.Mass.1988). The court, in discussing plaintiff's burden of proving causation, stated, "when a plaintiff alleges that chemicals have migrated underground from another site, the plaintiff must establish that the second site was in fact the source of the pollutants in question." *Dedham I*, 689 F.Supp. at 1225.

The court reasoned that causation is one of the essential elements of a prima facie case under CERCLA. *Id.* The plaintiff had argued that defendant should be strictly liable for any release, but the court stated that plaintiff's argument "confuses the principle of strict liability for the effects of a release, with the antecedent question of whether the release has any effects at all." *Id.* at 1225. The court determined that in cases where different persons deposited waste at one site, Courts have held that plaintiffs do not have to link specific wastes which were released to

---

**3.** Another prominent multiple-site case, *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532 (W.D.Mich.1989), and 790 F.Supp. 710 (1990), is not included here because causation was not discussed at length.

specific generators—the causal link is presumed. However, in a two-site case where waste is disposed of at one site and allegedly travels to a second site, the causal question becomes whether defendant's releases have any effect on plaintiff's site. *Id.* at 1227.

The district court, after a hearing on the motion, determined that any VOCs discharged on defendant's property did not enter the groundwater and travel to Dedham's wells. The court found that Cumberland itself was contaminated by one or more sources located upgradient. Based on all these factors, the court found that any discharge by Cumberland Farms did not cause any contamination at Dedham's wells. *Id.* at 1235.

Plaintiff appealed, arguing that the district court incorrectly held that Dedham must show that the VOCs actually migrated to their property in order to support a claim under CERCLA. Rather, Dedham argued that the proper causal inquiry is whether a release or threatened release caused a party to incur response costs. *Dedham II,* 889 F.2d 1146 (1st Cir.1989).

The circuit court held that it was error for the district court to require proof that defendant's hazardous waste actually migrated to plaintiff's property because it is possible for a defendant's release to cause plaintiff to incur costs in response to a release without the substances actually migrating there. *Dedham II,* 889 F.2d at 1154.

> [T]he district court did not consider whether defendant's releases (or threatened releases) might nonetheless have caused the plaintiff to incur "response costs" even though those releases did not *in fact* contaminate the wells. (A plaintiff, for example, under certain circumstances might reasonably think that a particular release would prove likely to contaminate his wells and spend money to avoid the contamination even though no actual contamination occurs.)

*Dedham II,* 889 F.2d at 1157. The trial judge's finding of no actual contamination was not challenged on appeal.

The case was remanded and reassigned to another judge to determine, despite the prior finding that no VOCs. actually migrated, whether response costs were incurred because of threatened releases from defendant's property. *Dedham III,* 770 F.Supp. 41 (D.Mass.1991). On remand, the court found that plaintiff discovered contaminants in the groundwater and took action to prevent further pollution before identifying defendant as a potential source. Therefore, the court found that plaintiff's response costs could not have been caused by the discovery of defendant as a potential source of past or future contamination. For this reason, the court denied liability on the CERCLA claim. *Id.* at 42–42.

The unsuccessful plaintiff again appealed. *Dedham IV,* 972 F.2d 453 (1st Cir.1992). The First Circuit affirmed the ruling below, but clarified the way in which a "threatened release" could cause response costs:

> [T]o the extent that [plaintiff's] activities— e.g., retaining consultants, performing scientific studies, building the treatment plant—were in response to *actual* contamination, Cumberland was home free. But, polluting substances that stopped short of the well's boundary could conceivably have caused the [plaintiff] to incur expenses compensable under CERCLA. (citation omitted). If, and to the extent that, Cumberland posed a threat, and Dedham acted in response thereto, Cumberland might be held liable.

*Dedham IV,* 972 F.2d at 457. To recover for a threatened release, "a plaintiff would first have to prove that it possessed a good-faith belief that some action was desirable in order to address a particular environmental threat. The plaintiff would then have to demonstrate that its response to the perceived threat was objectively reasonable." *Dedham IV,* 972 F.2d at 458 n. 2. In addition, the costs must be incurred as "an environmental rejoinder to threatened releases," and not "to define the magnitude of a known problem (actual contamination), to rectify that problem and, relatedly, to fix responsibility for it with an eye toward litigation." *Dedham IV,* 972 F.2d at 459. The court specifically held that the mere presence of actual contamination does constitute a threat of contamination for which the defendant could be liable. *Id.,* at 460.

*Artesian Water Co. v. New Castle*

The second two-site groundwater "causation" case is *Artesian Water Co. v. New Castle,* 659 F.Supp. 1269 (D.Del.1987), *aff'd,* 851 F.2d 643 (3rd Cir.1988), in which a water company brought suit to recover for response costs after a release or threatened release from a nearby landfill. The defendant conceded that there were contaminants in the its landfill and even in the groundwater around the landfill, but argued that the contamination of plaintiff's wells was the result of concurrent releases from a nearby site owned by a non-party. Plaintiff produced evidence that contaminants were released on defendant's site, while defendant produced nothing more than an expert's opinion critiquing the reliability of plaintiff's evidence.

The court held that plaintiff was entitled to summary judgment on the issue of release because defendant did not "take advantage of the opportunity to create a triable issue by offering independent evidence that no hazardous substances are present within the boundaries of the site." *Id.* at 1282.

Next, the court considered defendant's arguments on the issue of release. Both parties admitted that contaminants were present in the groundwater immediately surrounding defendant's dump. However, defendant argued that plaintiff had not proved that the contaminants had come from defendant's dump and that the contaminants were actually the result of a release at the site of a non-party. The court rejected defendant's argument that plaintiff must prove conclusively that the contaminants which were found in the water near the landfill actually came from the landfill. "From a technological standpoint, Artesian's ability to 'fingerprint' the leachate in the groundwater as emanating from either the Site or the DS & G Landfill is exceedingly doubtful. To impose such a requirement might permit the owners and operators of both facilities to avoid finan-

cial responsibility for the clean-up, and would thus eviscerate section 1007."[4] *Id.* at 1282. The court found that there was a release from defendant's site.

The court, did, however, recognize the necessity for a causal connection between the release or threatened release and the incurrence of clean-up costs. *Id.* at 1282 (citing *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 & n. 17 (2d Cir.1985); *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 674 (D.Idaho 1986)). The court then applied a concurrent cause approach in holding that "if the release or threatened release of contaminants from the Site was a substantial factor in causing Artesian to incur costs, the County may not escape liability merely because the other causes ... have contributed to the result." *Id.* at 1283. The court rejected defendant's proposed "but for" causation because it was inadequate where "two or more causes have concurred to bring about an event, and any one of them, operating alone, would have been sufficient to cause the identical result." *Id.* A defendant has caused an event if "it was a material element and a substantial factor in bringing it about." *Id.,* citing W. Keeton et al., *Prosser and Keeton on Torts* § 41, at 267 (5th ed.1984).[5]

The court, applying this test, found that the releases from defendant's landfill were a substantial factor in causing Artesian wells to incur clean up costs. Unlike *Dedham,* there was no requirement that plaintiff prove defendant's release actually contaminated its property since plaintiff incurred response costs as a result of the release, not the discovery of contamination.

Although the *Artesian* and *Dedham* cases seem at odds on the issue of "fingerprinting" contamination, they are easily reconciled. The *Artesian* court refused to require "fingerprinting" in order to prove that a release had occurred. Contamination was found im-

---

**4.** This language, on its face, seems at odds with the holding of *Dedham I.* However, as discussed *infra,* p. 1389, the two courts' holdings deal with different elements of the CERCLA claim and are easily reconcilable. *Dedham I* requires "fingerprinting" for proof of causation, while *Artesian* refused to require it for proof of release. The standards of proof are different as Congress and

the courts impose strict liability in the area of releases, while the statute, and even the *Artesian* court, require a finding of "causation."

**5.** The court applied the substantial factor test because it felt that CERCLA granted the Courts the right to create federal common law to apply to the statute. *Id.* at 1283 n. 25.

mediately surrounding defendant's dump. The defendant produced no affirmative evidence to prove that the contamination did not result from a release at the dump, instead, it only questioned plaintiff's ability to prove the contamination's source. The court, following *United States v. Wade, supra,* presumed that wastes immediately outside a dump containing wastes identical to those in the dump have been released from that dump.

Once the discovered wastes are no longer in the immediate vicinity of the dump, however, the question becomes one of causation, and "fingerprinting" becomes necessary to prove that the release was a "substantial factor." This view comports with the notions of fairness that have always been present with questions of causation in our legal system. A defendant may have committed a wrong on his own property, and a plaintiff may have been injured on his own property, but unless the defendant's wrong is causally-related to plaintiff's injury, the defendant should not be held liable. Relaxing that standard of proof as urged by FAG Bearings here would undermine this basic principle.

These two cases provide a rational framework for analyzing the causal link in a CERCLA claim. "Fingerprinting" to prove actual contamination caused by the defendant is not necessary where the plaintiff can show that the release or threatened release by the defendant, and not the actual contamination, caused the plaintiff to incur response costs. However, where the response costs are incurred solely as a result of and in response to the actual contamination, the plaintiff must prove that the release by the defendant actually caused the contamination at plaintiff's site, as contemplated by the *Dedham* court.

In this case, the first scenario is not at issue. All of the response costs alleged by Silver Creek and Saginaw Village in the principal complaint are related to the discovery of actual contamination, and not in response solely to a discovered release or the threat of future contamination by FAG Bearings or the third-party defendants. Therefore, FAG Bearings, as well as the class-action plaintiffs, must prove the source of the contamination in order to satisfy the elements of a CERCLA claim.

Therefore, the inquiry before this Court on this motion for summary judgment is whether FAG Bearings has come forward with sufficient facts that would be admissible at trial that would allow a reasonable jury to find that a third-party defendant caused the TCE contamination in the groundwater at Silver Creek and Saginaw Village. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

While there may be clear and direct evidence of causation in certain groundwater contamination cases, the analysis is usually somewhat more based on indirect evidence and weighing of multiple factors. *See* William W. Rodgers, 2 *Environmental Law— Air and Water,* § 4.7, at 99–102 (West 1986 & Supp.1992). Factors to consider include: the location of the wells; the proximity of the contamination to the wells; the geology; the nature of the contamination; and the quantity of contamination.

The third-party defendants argue that FAG Bearings has not presented sufficient evidence of these factors to allow a reasonable jury to find any one of them caused the contamination at Silver Creek and Saginaw Village.

FAG Bearings presents several types of evidence to oppose the summary judgment motions: test data that indicates the presence of TCE-related substances on the third-party defendants' properties in varying concentrations; reports indicating the use of TCE-related substances at some of the sites; and most importantly, a hydrogeologist who interprets the available data and opines that releases may have occurred at each of the third-party defendant properties, and that the contaminants released reached a Saginaw Village and Silver Creek by way of a hypothesized underground water pathway.

In this motion for summary judgment, the third-party defendants contest both the first and third elements of the CERCLA claim as defined by the Court. The issue before the Court is, then, whether FAG Bearings' evidence is sufficient to withstand summary judgment on these issues?

## FAG BEARINGS'. EVIDENCE
## OF CAUSATION

The primary issue is whether FAG Bearings has presented sufficient evidence for a jury find that, if TCE was released from a third-party defendant's property, did it actually cause the contamination in the drinking water wells that has caused plaintiffs to incur response costs. FAG Bearings' evidence on this issue is common to all third parties. FAG Bearings first alleges it has evidence to prove that releases of hazardous substances at the third-party defendants' sites leached into the groundwater beneath those sites. Next, FAG Bearings alleges that there is a genuine issue of fact whether those leachates entered a groundwater pathway running generally northeast to southwest that carried hazardous substances from the third-party defendants to Silver Creek and Saginaw Village.

This theory is presented by Randall J. Overton, a hydrogeologist with Tetra Tech, a consulting firm hired by FAG Bearings. Overton prepared a report on his findings, testified about his opinions at length at a deposition, and submitted an affidavit with FAG Bearings' suggestions in opposition to this motion.

Overton holds the opinion that the pathway runs under or near each third-party defendant, with the exception of Vickers, and towards Silver Creek and Saginaw Village. Overton readily admits that although he knows the general contours of the pathway, he cannot say definitely that the pathway actually runs from any particular third-party defendant to Silver Creek or Saginaw Village. Nor can he state that any contaminant has, in fact, migrated from any third-party's site to the drinking water wells. Overton stated that extensive additional testing must be conducted to establish such a link for certain. His testimony is the only evidence FAG Bearings presents on the issue of causation.

With this explanation in mind, the question before the Court becomes: Could a jury find, from Overton's opinion that the groundwater pathway exists and that it generally runs from the third parties to the drinking wells, that any release at a third-party defendants'

site caused or contributed to cause the contamination at in Silver Creek, Saginaw Village, or at FAG Bearings' facility? To answer this question, the Court looks to the Overton's own words. The following are numerous examples of the Overton's testimony on the subject of establishing definitely the boundaries of the pathway and determining who is responsible for the contamination at Silver Creek and Saginaw Village. They demonstrate his lack of scientific "certainty" on central issues:

*He does not have sufficient information to identify the source of the contamination:*

Q. In the third paragraph of Page 42 [of the consultant's report], Mr. Overton, you suggest that additional investigative work also needed to be conducted to identify source areas for soil and groundwater contamination.

A. Yes.

Q. I take it by this statement that insufficient data is available to you now to determine whether or not any of the facilities of the third-party defendants are sources of groundwater contamination at Silver Creek or Saginaw Village. Is that true?

A. Don't have specific information that would allow me to draw a conclusion that they are.

Q. You do not have that?

A. No, do not. We have, of course, general information, some data that suggests that contamination—contaminants are present in the soils.

Q. But insufficient data to determine whether or not it's contributing to contamination—

A. Insufficient to determine if there's a sufficient source on those sites to be contributing to groundwater contamination.

Q. At Silver Creek and Saginaw Village?

A. At Silver Creek and Saginaw Village.

Overton deposition, at 42–44.

*He has formed an opinion that an underground pathway exists generally, but cannot link it to any particular third-party site:*

Q. Did I misunderstand your testimony just now that you have, in fact, been able to form opinions and conclusions and

therefore defined the groundwater contaminant pathways near Silver Creek or Saginaw Village?

A. Yes, I formed opinions about the general groundwater contaminant pathway in that vicinity of Joplin and including Silver Creek and Saginaw Villages, but do not make the mistake that that's all that is needed to determine specific or very specific pathways from, you know, specific facilities to the wells. The general pathway exists. The specific pathway of the contaminants and the fate of the contaminants within that pathway, that is in question.

Overton deposition, p. 34.

*Overton can only speculate that Gulf States is a potential contributor:*

Q. So, other than what is in the report and the groundwater pathway that you discussed earlier, there are no other facts that you're relying on to say that Gulf States is a potential source of contamination at Silver Creek and Saginaw?

A. That's correct. See, the—it might be helpful for me to just describe it. You know, really the basic approach taken in this whole thing was I spent quite a bit of time looking at information and developing the conceptual groundwater pathway, and later adding on to that the sources that had the potential to contribute to groundwater contamination.

. . . . .

A. ... My goal in doing it that way is, mind you, we have a pathway, and now it's in my mind did the potential exist for that facility—based on the compounds present, for it to be a contributor?

Overton deposition, at 267–68.

*He does not have the information to form any opinion as to whether any facility was the actual source of the contamination:*

A. All right, I formed an opinion that there has been a release of compounds, using the "compounds," because they vary, in the soils on facilities, based on the presence in the soils. And whether or not—I have not formed an opinion that they are specifically the source of contaminants found in the Silver Creek and Saginaw

Village wells because that data just doesn't apply at this point to arrive at such an opinion.

Q. ... [H]ow is it, then, that you are certain that a contaminant transport pathway exists between those facilities and Silver Creek and Saginaw?

A. The pathway exists independent of whether or not contaminants were actually transported. Okay? That information, the existence of that pathway, I'm very comfortable that that's there, that the general pathway exists. Refining it is something that needs to be done to arrive at a specific determination as to specific facilities and their contributions, those types of things. There's sufficient information available, I believe, to find that the pathway does exist. There's insufficient data available to say that specific compounds from various facilities are the result of contamination found in Silver Creek wells, because the data hasn't been collected yet. The same compounds occur and they are in the soils on the facilities over the pathway.

Overton deposition, at 32–33.

*All he can say is that there is a "likelihood" that someone "could" have contributed to the contamination:*

Q. And that is your belief; correct? That to date there has not been sufficient investigation to determine whether contaminants have migrated from the identified facilities and how far the contaminants may have moved?

A. That's correct. What we have at this time is information about the nature and probable behavior of a groundwater pathway and potential sources over the pathway. That's what we have.

Q. All right. And you don't have enough data to tell Judge Stevens that contaminants move from Vickers to Saginaw Village or Silver Creek?

A. I have enough information to tell Judge Stevens that there's a high likelihood that the facilities identified here could be contributing to the contamination of Silver Creek.

Q. My question to you is, sir, do you have enough data to tell Judge Stevens contami-

nants did move from Vickers to Silver Creek?

A. In an absolute sense, no.

Q. The same question with regard to Saginaw Village. Do you have enough data to tell Judge Stevens contaminants did move from Vickers' facility to Saginaw Village?

A. In an absolute sense, no.

Q. All right. And as a matter of fact, there is not enough data to say positively yes or positively no?

A. That's correct.

Q. And if—

A. In absolute—

Q. —we want to take the word "positively" out, the most you can say is there is a potential—

A. Yes, I have been using the word "potential."

Overton deposition, at 121–22.

*Finally, Overton again emphasizes that the essence of his opinion that there is "reason to believe" that someone could be a "potential contributor:"*

Okay, well, there simply isn't enough available information from any party just to draw a conclusion that there's a definite contribution from any one party at all that I have seen or has been made available to me. However, we generally find occasions of various contaminants in a number of places out there over what I've been referring to as the general ground water pathway. All right? And consequently while we don't have sufficient specific information or data to say this facility is an absolute contributor to some percentage, given the presence of compounds in soil and groundwater, there's, you know, reason to believe that they are a potential contributor or that's a potential source.

Overton deposition, at 25–26.

The task confronting the Court is to determine whether the hydrologist's opinions are such that they would be admissible at trial and whether they would allow a reasonable jury to find causation.

All testimony from a qualified expert is not automatically admissible. Rather, the dis-

trict court is given the role of gatekeeper: "[U]nder the Rules, the trial judge must ensure that any and all scientific testimony is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).

 The Eighth Circuit has held that in the case of expert opinion testimony, "[w]hen basic foundational conditions themselves are conjecturally premised, it then behooves a court to remove the answer from one of admissible opinion to one of excludable speculation." *Twin City Plaza, Inc. v. Central Surety & Insurance Corp.,* 409 F.2d 1195, 1200 (8th Cir.1969). Opinions of an expert need not be accepted when they are based on nothing more than personal opinion or belief, instead of an understandable scientific basis. *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992); *see also Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 423–24 (5th Cir. 1987); *Calhoun v. Honda Motor Co.,* 738 F.2d 126, 131–32 (6th Cir.1984). "Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795. "But, in order to qualify as 'scientific knowledge,' an inference or assertion must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* That testimony about "scientific knowledge," in turn, must be based on "verifiable propositions of fact." *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1249–50 (D.C.N.Y. 1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). Such evidentiary reliability is not present when the "scientific" opinion is premised on fundamentally unsound bases or a fatally deficient amount of data. *E.g. Renaud v. Martin Marietta Corp.,* 749 F.Supp. 1545, 1552–53 (D.Colo. 1990) (in toxic tort exposure case, use of single data point to describe continuous releases of contaminants over extended period

was inadmissible conjecture), *aff'd*, 972 F.2d 304 (10th Cir.1992). A factual basis may be so lacking for an opinion so as to render it scientifically unreliable. In such a case, "[m]ere possibilities or conjecture cannot establish a probability." *Renaud*, 749 F.Supp. at 1553. It is central to the concept of expert testimony that such testimony is only admissible if it speaks in terms of probabilities instead of possibilities. *Lanza v. Poretti*, 537 F.Supp. 777, 786 n. 14 (E.D.Pa.1982). Accordingly, a scientific opinion that cannot establish a probability cannot be the basis on which a reasonable juror can find in favor of a proposition. *Renaud*, 749 F.Supp. at 1553; *see also Turpin*, 959 F.2d at 1359 (expert testimony on possibilities insufficient to withstand summary judgment on issue of causation). Finally, "[c]ourts are particularly wary of unfounded expert opinion when causation is the issue." *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223, 1249 (D.C.N.Y.1985).

■ In this case, Overton's opinions are concocted of impermissible bootstrapping of speculation upon conjecture. He first speculates that any contamination in the soil at third-party defendant sites entered the groundwater. This first conjecture is made without the benefit of any factual data about the nature or depth of the alleged contamination, the composition of the earth below the site, its proximity to the "conceptual" underwater pathway or the amount of contaminants allegedly released. Overton's second speculative assumption is that the contaminants that may have entered the groundwater, may have travelled this generalized, unchartered subterranean river and contaminated Silver Creek and Saginaw Village.[6] He admits that, although he is confident of the existence of the pathway and its general flow, there is no information available to say to any degree of certainty that contaminants went from point "A" to point "B."

While Overton may be permitted to testify that such groundwater pathways are general-

ly recognized in his scientific community, opinions about causation on a particular site must be supported by some factual basis to remove them from the realm of impermissible speculation. The entire deposition demonstrates the limitations of his knowledge and his inability to pinpoint the source of the contamination.[7] Overton's testimony about every third-party defendant being a "potential" contributor is not admissible because it does not establish any one party as even "probably" being causally linked to the contamination. He cannot say, with any reasonable degree of scientific certainty that any cause is more than just a possibility. His opinions have nothing to do with probabilities and, therefore, are not properly the subject of expert testimony.

In the words of the *Turpin* Court, "[Overton's] conclusion so overstates its predicate that we hold that it cannot legitimately form the basis for a jury verdict. Beyond that [Mr. Overton's] opinion testimony, to the extent that it is personal opinion ... is inadmissible.... The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation." *Turpin*, 959 F.2d at 1360–61. This Court agrees. Overton would not be allowed to express his unfounded opinions during trial and, accordingly, they will not be considered in this summary judgment motion. Accordingly, FAG Bearings cannot withstand summary judgment on the element of causation. While the lack of this element should be dispositive, the Court will continue and analyze the issue of "release" because those findings underline the speculative nature of FAG Bearings' case.

## FAG BEARINGS' EVIDENCE OF RELEASE

The already conjectural nature of Overton's opinions as to causation are further

---

6. Overton's conjecture about the path from the Vickers facility, which is located far away from the pathway's projected flow is fanciful at best. See *infra*, pp. 1396–97.

7. The Court does not mean to imply that Overton is not an able hydrologist. Rather, the Court's

comments are directed to Overton's investigation into and knowledge of this particular site. It is abundantly clear that, for whatever reason, Overton was not given the opportunity to make the type of personal investigation that would have allowed him to reach actual conclusions, rather than speculations.

undermined by what is,. in most instances, seriously deficient evidence of any release, for without a release, there certainly is not question of causation. As is discussed in detail below, the evidence on release as to several third parties may be sufficient to withstand the very generous standard under Rule 56(e). However, the evidence against other parties is no more than "a mere scintilla" and cannot withstand summary judgment.

A release is defined in 42 U.S.C. § 9601(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" of hazardous substances.

As to this element, FAG Bearings has little direct proof that releases have occurred at the sites of the third-party defendants. In several cases, there are Environmental Protection Agency (EPA), Missouri Department of Natural Resources (MDNR), or company documents that detail releases of TCE-related substances. In all other cases, however, FAG Bearings and its expert rely on preliminary soil gas sample tests that reveal the existence of quantities of TCE, 1,1 DCE or related compounds. Only Midcon's property tested positive for TCE. The others only contained DCE or related compounds, and very few of these findings were ever confirmed. The quantity of these compounds ranges from traces to more significant numbers.

The Court will address each site in turn to determine whether the evidence of release is sufficient to withstand summary judgment.

### Pillsbury

■ Ecology and Environment, Inc. (E & E), an independent contractor doing testing for the Missouri Department of Natural Resources, took four soil gas samples. Of those, only point 1 had traces of 1,1 DCE. The point was tested twice, revealing levels of 1,1 DCE between 116.5 and 124.8 ppb. To confirm these preliminary indications, E & E took a summa canister (BC1HK102) and a soil sample (BC1HK001) for later testing. A split of the soil sample was given to Pillsbury. The summa canister later registered only pentane and benzene. The soil sample gave no notable results. *See* E & E Report,

attached to Overton's deposition as Exhibit E.

Overton testified that he is not aware of anything other than the soil gas sample to indicate that TCE, DCE or any breakdown substance is or was present in the soils at the Pillsbury site. Overton deposition, at 145–46.

For Pillsbury to be a "responsible party" under CERCLA, there must have been a release of hazardous substances from Pillsbury's property. The only evidence presented by FAG Bearings to suggest that a release occurred is that one field soil gas sample test suggested the presence of 1,1 DCE, which is an alleged breakdown component of TCE, the substance found in the plaintiffs' wells. Overton contends that TCEs are commonly found in fumigants used on grain such as that used by Pillsbury. However, this is nothing more than an uneducated guess. FAG Bearings has supplied no evidence whatsoever that TCEs or any related substance was ever on the Pillsbury site, through fumigants or otherwise. The Court has thoroughly reviewed the deposition of Mr. Overton and finds that he admits not being able to trace any TCEs or similar compounds to the Pillsbury site. Overton deposition, at 146–147.

The scant evidence of the soil gas test is insufficient to rebut Pillsbury's showing that an essential element, a release, is missing from FAG Bearings' case. FAG Bearings' only evidence which they contend would create a genuine issue of material fact, then, is the soil gas testing that revealed trace amounts of DCE. While the Court finds that FAG Bearings is completely unable to establish any inference of a "release" of TCE or DCE by Pillsbury, the Court also finds that the soil gas test is merely a "scintilla of evidence" and would not be sufficient to establish that hazardous substances were ever used at the Pillsbury facility in the first place.

In addition, Pillsbury later retained its own testing company. The results of those soil sample tests failed to confirm the existence of TCE or 1,1 DCE.

One unconfirmed sample result indicating traces of a breakdown product of TCE is wholly insufficient to withstand a motion for summary judgement, especially in light of FAG Bearings' complete inability to prove that TCE has ever been present at the site. There is simply no evidence that Pillsbury ever used, handled, stored or disposed of TCE or DCE, as it alleges in its complaint. Therefore, Pillsbury's motion for summary judgment shall be granted.

### Contract Freighters, Inc.

██ FAG Bearings alleges two grounds for finding that this party contributed to the contamination. First, FAG claims that the substance naphthalene was released at this defendant's site and was also found with TCE at the Silver Creek and Saginaw Village, proving the connection between the two sites. Needless to say, this alone is not sufficient to link the contamination to CFI.

Second, Fag points to the E & E test results. E & E tested the soil in seven spots on CFI property. The field tests registered 1,1 DCE, a relative of TCE, at points 3 and 4 near an old oil-waste storage tank. Those readings registered between .85 and 2.25 ppmV. A soil sample was taken from point 3 (BC1HK003) for lab testing. Later testing revealed no significant levels of contaminants. While the E & E report shows no detects of TCE, the field analytical results attached to the report do indicate small amounts of TCE. While these results are still inconclusive, they may raise a material issue of fact about a "release" of TCE at CFI's property. However, they do nothing to overcome the causation problem discussed above. Overton expressly stated that he is unable to state, with any degree of certainty that any molecules of contamination travelled from CFI's property to the affected wells. Overton deposition, at 38. Overton's lack of certainty is due to an absence of data. Overton deposition, at 39. The Court has no choice but to enter summary judgment against FAG Bearings based on lack of evidence to establish causation.

### Service Packing Co.

E & E field test results showed high levels of 1,1 DCE. Both soil samples revealed levels of 1,1 DCE. The sample from point 1 was taken "near a drainage downstream of a waste treatment lagoon," where the soil was "similar to FAG subsurface soil." E & E report, at 8. Sample 2 showed the highest levels of DCE—2.34 ppm and was the subject of a soil sample taken for laboratory testing (BC1HK008). The soil sample did not reveal TCE or related substances. Like the test results from CFI, these results are unreliable and inconclusive, but may raise a question of material fact about the "release" issue. However, like all the other claims, FAG Bearings has no evidence of causation to link this defendant to the contamination. Therefore, this third-party defendant is entitled to summary judgment as well.

### International Paper Co. (IPCO)

This property was classified as a hazardous waste site in 1984 because of presence of creosote, naphthalene flouranthene, pentachlorophenol, arsenic and chromium, in the soil, surface water and groundwater at the site. Exhibit H, attached to Overton's affidavit, at 44. However, MDNR has stated that IPCO does not appear to be related to TCE contamination at Silver Creek. Exhibit H, at 45.

In 1984, MDNR found trace levels (5 ppb) of PCE, a TCE-related substance in Joplin Creek at or near edge of IPCO facility. In a mineshaft spring on the property, the MDNR found 8 ppb of 1,1 DCA, 9 ppb 1,1 DCE, and 4.8 ppb TCE. In 1987, the MDNR found 2100 ppb of PCE, but no other TCE-related substances, in pretreated industrial waste that was discharged from the facility. Exhibit J.

MDNR conducted tests at International Paper in 1992 for the presence of TCE. Those test results from January 15–24, 1992, and June 17–July 16, 1992, show no detectable amounts of TCE-related substances. These results were left out of Overton's report. Overton deposition, at 366–68. He says those results should have been included in his report, and that they underline the complexity of the situation and the need for further research. Overton deposition, at 369.

The MDNR reports were made concurrently in January 1992 with the E & E tests which took place at other sites in area. The

testing consisted of the sampling of groundwater from four monitoring wells on and adjacent to IPCO property. (Samples 92–0601, 92–0602, 92–0603, and 92–0605). The samples uniformly registered non-detects for TCE-related substances. In July 1992, MDNR conducted another test. This time, one sample was taken from monitoring well on IPCO property (# J23–164). The report was non-detect for all TCE-related substances. Reply Exhibit E.

IPCO presents the affidavit of James L. Grant, an engineer who has overseen IPCO's groundwater monitoring for the past 10 years. Reply Exhibit C. Grant claims that he knows of no TCE or related compounds ever used at the site, or that have appeared in groundwater samples. Grant Affidavit at 2. He claims that the detects in the E & E tests are inherently unreliable because they occurred at or very near the limits of the testing method utilized. Grant Affidavit, at 2. Overton agrees that these tests are less reliable as they near the detection limits. Overton deposition, at 364.

Finally, IPCO has tested groundwater taken from monitoring wells in accordance with 40 C.F.R. § 264 Appendix VIII. The tests have tested negative for the presence of TCE-related substances. Grant Affidavit at 2–3.

While there are inconsistencies about the presence of TCE-related substances, the Court cannot conclude that there is no issue of fact about a "release." However, as with all other third-party defendants, FAG Bearings cannot connect any alleged releases with Silver Creek or Saginaw Village, and summary judgment must be granted.

### Midcon Cables Co.

Midcon Cables is documented to have used TCE on its property since 1980. Exhibit S, attached to the Overton's Affidavit. There are no documented spills, but its response to the United States Environmental Protection Agency's request for information states, "All solvent wastes during the years 1980 and 1981 were spread on the ground at the back of the facility property and allowed to evaporate. Subsequently the topsoil in the area was excavated for the purpose of parking lot construction. No adverse environmental impact has been observed." Exhibit S (Response to Question Number 9).

E & E soil testing at seven sites revealed TCE and/or DCE at several locations. A soil sample at point number 5 revealed .12 ppm of 1,1 DCE and 1.86 ppm of TCE. A soil gas sample of the same site revealed 1.56 ppm of 1,1 DCE. A soil sample of point 6 showed .51 ppm TCE. Points 5 and 6 were located downgradient of a fenced drum storage area. A summa canister (BC1HK101) and a soil sample (BC1HK002) were taken from point 5 for laboratory analysis. A split of the soil sample was provided to Midcon. While the soil sample did not yield any notable results, the summa canister revealed trace amounts of TCE and other VOCs. E & E, at 10–11. The Midcon site was one of two sites (FAG Bearings being the other) where laboratory results confirmed the presence of TCE.

FAG Bearings has provided sufficient evidence of "release" to withstand summary judgment, but cannot causally link Midcon Cables to the contaminated sites. Once again, summary judgment is proper.

### Motorola, Inc./Gulf States Paper Co.

Gulf States uses several tons of TCE every year. By Gulf States' own account, past use at this site has resulted in 103 tons of fugitive emissions. In addition, Motorola has used TCA, a substance related to 1,1 DCE, and that was found at Silver Creek and Saginaw Village. Preliminary soil tests reveal high levels of those hazardous chemicals.

An E & E soil gas sample collected at point 2 registered 12.62 ppm of 1,1 DCE. MDNR reported that Gulf States had once reported a 1,1 DCE spill and clean-up near point 2. A summa canister was collected from this point for lab analysis (BC1HK103). Later tests on the canister reported high levels of 1,1 DCE, 1,1 DCA, and 1,1,1 TCA. E & E report, at 11.

Gulf States records reflect that it has used TCE at the site since 1989. Exhibit N, attached to Overton's Affidavit. Gulf States estimates that 103.54 tons of TCE are released into the atmosphere as fugitive emissions each year. Exhibit N, at 13. MDNR

took soil samples in 1988. Two different locations revealed 150 ppb of 1,1 DCE.

Gulf States is another site for which FAG Bearings has presented evidence of release, but no evidence of causation at all. Summary judgment for Gulf States is proper as well.

### Vickers Co.

It is clear that serious "releases" of numerous hazardous substances, including TCE, have occurred at the Vickers facility. While a "release" is fairly certain to have occurred, FAG Bearing's causation case against Vickers is the weakest of any third-party defendant.

The Vickers site is five miles away from Silver Creek and Saginaw village. According to FAG Bearings' own expert, this is well outside of the groundwater pathway. Overton deposition, at 420. FAG Bearings cannot establish beyond pure conjecture that contaminated water from Vickers could have entered the alleged pathway. Overton Deposition, at 121–23, and 419 1. 20. At best, FAG Bearings' expert can only confirm the "potential" of contaminants from Vickers reaching the polluted wells. Overton Deposition, at 121. Overton's conjecturing about the possibility of water taking precipitous turns and leaps through distressed formations as a result of groundwater pumping the 1960s is supported by no facts. His speculation is especially dubious considering that he stated the pathway flows in a southeast direction, but Vickers is five miles away in a southwestern direction. Overton deposition, pp. 129–130. The evidence from the EPA and others who have investigated the site is that no one knows where the water underneath the site goes. Overton himself testified that the brecciated zones that surround Joplin and include the hypothetical underground pathway do not extend to Vickers' facility. Overton deposition, at 431. Overton admits that he has no piece of test data to support his hypothesis. In his own words, it is his "best guess." Overton deposition, page 435.

FAG Bearings' claim cannot survive summary judgment based on the absence of information that is absolutely critical to the causal link. Unlike the situations with known releases occurring on top of Overton's alleged pathway, in which the opinion on the flow of the contaminants is based on logical deductions, the opinion as to Vickers is based on conjecture in the absence of facts where the best Overton can conclude is that the flow is conceivable.

### CONCLUSION

In most instances, the "evidence" pointing to a release of TCE or related substances is gossamer thin and relies on unverified detections of trace elements in untrustworthy preliminary field tests. No further tests have been done to prove or disprove the field test results. This lack of evidence of a release is, by itself, almost sufficient to entitle some third-party defendants to summary judgment.

While the highly questionable evidence of release is nearly fatal to FAG Bearings' case, the absence of admissible evidence on the issue of causation leaves no doubt. These deficiencies are likewise fatal to all state law claims raised by FAG Bearings. They will not be discussed separately.

The Court, with the able assistance of Magistrate John T. Maughmer, formulated an accelerated discovery schedule by which the third-party defendants could learn whether they should be a part of this lawsuit. The discovery schedule was designed to allow FAG Bearings and the third-party defendants to discover whether they contributed to the contamination at Silver Creek and Saginaw Village. Now, through the mechanism of the summary judgment motion it is time for FAG Bearings to show why those parties should have to continue to defend this lawsuit. Given the expensive and time-consuming burden an environmental lawsuit places on the parties, the Court must not allow a party to continue as a defendant based on nothing more than mere speculation. FAG Bearings has had a considerable amount of time to discover who might be liable for the contamination at Silver Creek or Saginaw Village. The Court's analysis of the evidence they are able to present makes it clear that the third-party complaint is based on nothing more than inadmissible

speculation. Neither before the suit was filed nor during discovery did FAG Bearings develop facts to support its claims. For whatever reason, FAG Bearings did not conduct independent testing that would conclusively determine the parameters of the groundwater pathway and the source of the contamination. Instead, FAG Bearings relied on questionable data from the Missouri Department of Natural Resources and the conjectural personal opinions of a hydrologist. Consequently, the case against the third-party defendants now must end.

### FAG Bearings' Motion for Additional Discovery

While opposing these motions for summary judgment, FAG Bearings also requests additional time to discover evidence to bolster their opposition. Overton, in his deposition, estimated that testing adequate to defining the pathway and fingerprint the source of contamination would take at least one year. FAG Bearings has already been given considerable time in which to begin this crucial testing. It apparently did not wish to do so until failure in this Court seemed imminent. The Court will not delay this case for one year so FAG Bearings can make up for squandered time. Time has run out and any significant delay would prejudice all parties and inconvenience the Court. Ironically, FAG Bearings itself has opposed attempts at delay by the plaintiffs and has requested an early trial setting. That early setting has now been granted.

With these factors in mind, the Court cannot, in good conscience, order another fishing expedition on this complaint. Those third-party defendants against whom FAG Bearings has no evidence must be cut free.

Although the Court will grant summary judgment and will not acquiesce to FAG Bearings' plea for more time to make its case, the Court does not intend to preclude all means of resolving fully the issues raised in FAG Bearings third-party complaint. The summary judgment motion is granted on the grounds that FAG Bearings cannot produce more than a scintilla of evidence at this time. The Court does not imply that FAG Bearings' case, at this point, is legally flawed or

factually impossible. For these reasons, the dismissal of the third-party complaint is to be without prejudice.

FAG Bearings may use whatever means available to uncover the evidence that is so sorely lacking at this point. When that evidence plausibly connects another party to the contamination at Silver Creek and Saginaw Village, FAG Bearings may file a complaint against any parties so connected.

### FAG Bearings' Rule 45 Subpoenas

Subsequent to the Court's oral notice that summary judgment would be granted as to all third-party defendants, FAG Bearings served Rule 45 subpoenas on all third-party defendants requesting permission to access their property to conduct geophysical surveys and soil-gas, soil and groundwater testing. The third parties all objected to the requests. Several filed motions for a protective order, while others filed written objections to the subpoenas.

Fed.R.Civ.P. 34(a) provides that "[a]ny party may serve on any other party a request ... to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property ... within the scope of Rule 26(b)." Although Rule 34(a) applies only to parties, Rule 34(c) states "[a] person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45."

Under Rule 45(b), a subpoena for an inspection may be issued to any person not a party. Under Rule 45(c), the non-party may file written objections or may file a motion to quash or modify the subpoena. When written objections are filed, the requesting party must file a motion to compel. FAG Bearings has done so.

The third-parties make three main objections to the subpoenas. First, they argue that the subpoenas are procedurally flawed. FAG Bearings has filed amended subpoenas and the Court believes that they comply with Rule 45.

Second, the third-parties argue that the Rules do not provide for inspections of non-parties. As outlined above, the Rules clearly provide for this type of exercise.

 The third argument is that the inspections constitute undue burdens, they are prejudicial, and are merely an attempt to circumvent the Court's summary judgment ruling. The inspections are to be conducted by and at the expense of defendants and they do not appear to involve any burdensome requests. While the inspections may be prejudicial in that they provide evidence that exonerates FAG Bearings and implicates a third-party defendant, this is not a legitimate reason to prevent discovery. Finally, the underlying premise of this Court's opinion on the summary judgment motion is that FAG Bearings has not done the work necessary to show that a third-party defendant may be causally-linked to plaintiff's complaint. The purpose of granting this motion without prejudice is to allow FAG Bearings to bring suit against another party only when and if it has procured admissible evidence to show that another party is liable. It is this Court's express intention that FAG Bearings be afforded an opportunity to make such a showing by using any means available.

The Silver Creek and Saginaw Village plaintiffs also object to the requests for access on the grounds that FAG Bearings should not be allowed to shift the focus of the trial from its alleged wrongdoings to the alleged wrongdoings of others. While Missouri law does not allow the jury to apportion fault to non-parties, FAG Bearings may prove its innocence of wrongdoing by proving that someone else is responsible. In *Dedham Water Co. v. Cumberland Farms (Dedham I)*, 689 F.Supp. 1223, 1235 (D.Mass. 1988), discussed above, the court relieved the defendant of liability because the defendant proved that its own property was contaminated by sources located upgradient. This is the same theory proposed by FAG Bearings and it is relevant to the defense against plaintiffs' case.

It would be unfair for this Court to rule against FAG Bearings on the summary judgment motion because of lack of evidence, and then use the power of the Court to prevent them from discovering the evidence the Court requires. Therefore, the Court shall allow FAG Bearings to inspect the property of the third-party defendants pursuant to Rules 34 and 45.

Accordingly, it is

ORDERED that all third-party defendants' motions for summary judgment are GRANTED. The third-party complaint of FAG Bearings is dismissed without prejudice. It is further

ORDERED that FAG Bearings motion to conduct further discovery is DENIED. It is further

ORDERED that the third-party defendants' motions to quash or for a protective order are DENIED. It is further

ORDERED that the objections to the subpoena filed by third-party defendants are OVERRULED. FAG Bearings motion to compel compliance with the request for inspection is GRANTED.