**KALAMAZOO RIVER STUDY GROUP, Plaintiff,**

v.

**ROCKWELL INTERNATIONAL, et al., Defendants.**

No. 1:95–CV–838.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 21, 1997.

**816**

Alan C. Bennett, Law, Weathers & Richardson, Grand Rapids, Jerome T. Wolf, Sonnenschein Nath & Rosenthal, Kansas City, MO, for plaintiff.

Kathryn J. Humphrey, Joseph C. Basta, Dykema Gossett, PLLC, Detroit, MI, for defendants Rockwell Intern. Corp., Eaton Corp.

Dustin P. Ordway, James Gavin O'Connor, Dickinson Wright, PLLC, Grand Rapids, MI, for Menasha Corp.

Douglas E. Wagner, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Upjohn Co.

Arthur H. Siegal, Jaffe, Raitt, Heuer & Weiss, PC, Detroit, MI, for defendant Rockwell International Corporation.

### *OPINION*

ROBERT HOLMES BELL, District Judge.

Plaintiff Kalamazoo River Study Group ("KRSG") filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as amended ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and the Michigan Natural Resources and Environmental Protection Act of 1994 as amended ("NREPA"), M.C.L. §§ 324.20101, et seq., seeking contribution for response costs incurred in responding to releases of polychlorinated biphenyls ("PCBs") into the Kalamazoo River. This case is currently before the Court on Defendant Benteler Industries, Inc.'s motion for summary judgment and on Plaintiff KRSG's conditional motion for extension of time to respond.

### I.

Based upon studies conducted between 1972 and 1989, the Michigan Department of Natural Resources ("MDNR") determined that a 3 mile portion of Portage Creek from Cork Street to the Kalamazoo River, and a 35 mile portion of the Kalamazoo River from this confluence downstream to the Allegan City Dam (the "Site") were heavily contaminated with PCBs. In 1990 the Site was listed

by the MDNR as an environmental contamination site under the Michigan Environmental Response Act ("Act 307"), M.C.L. §§ 299.601 et seq. The Site was also listed by the U.S. Environmental Protection Agency ("EPA") on the National Priority List ("NPL") as a Superfund Site pursuant to CERCLA § 105, 42 U.S.C. § 9605.[1] The MDNR and the EPA entered into an agreement authorizing the MDNR to conduct an Endangerment/Risk Assessment for the Site.

The MDNR identified three paper companies with facilities located on or near the Kalamazoo River as potentially responsible parties as a result of their past recycling operations during the period 1957–1971 which included the de-inking of carbonless copy paper which contained PCBs. These companies, HM Holdings, Inc., Georgia–Pacific Corporation and Simpson Plainwell Paper Company, entered into an Administrative Order by Consent with the MDNR to undertake a Remedial Investigation and Feasibility Study. James River Paper Company, Inc. eventually joined with the other three paper companies to form Plaintiff KRSG, an unincorporated association. KRSG filed this suit against 8 other companies with facilities on or near the Kalamazoo River, alleging that they contributed to the PCB contamination, and seeking reimbursement or contribution for response costs.

## II.

Defendant Benteler Industries, Inc. is engaged in the manufacture of automotive parts. Benteler purchased the Galesburg manufacturing facility at issue in this case in 1989. The facility had previously been used by General Signal Corporation and ICM Acquisitions. The facility is located upstream of the Kalamazoo River Superfund Site, about 3200 feet from Morrow Lake. There is a drainage ditch on Benteler's property that runs from a headwall next to the Benteler parking lot south approximately 1/2 mile (3200 feet) towards Morrow Lake. Morrow Lake is an impoundment of the Kalamazoo

River formed by Morrow Dam. Morrow Dam is approximately 4.25 miles upstream from the Site.

When Benteler purchased the Galesburg facility, there were transformers and capacitors in the manufacturing buildings which contained PCBs. In 1989, while Benteler was preparing the facility for use, one of the transformers on site was damaged and leaked PCBs. In the process of responding to this leak, Benteler discovered PCBs throughout the plant, in the ditch near the headwall, and in the drain lines leading to the ditch. Site investigations were performed in 1989 and 1991 to determine the extent of contamination in the drainage ditch.[2] In 1993 remedial actions were taken to remove PCBs from the drainage ditch. The remedial actions included excavation of 800 cubic yards of soil from the first 600 feet of the ditch. All remediation activities were completed by October 11, 1993. Further verification samples were taken in 1994 and 1996. On October 16, 1996, the Michigan Department of Environmental Quality ("MDEQ") issued Benteler a clean closure letter.

## III.

This matter is before the Court on Defendant Benteler's motion for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Defendant has the initial burden of demonstrating that there is no genuine issue of material fact as to the existence of any element essential to Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir.1996). Once the defendant has carried its burden of showing there is an absence of evidence to support a claim, the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a

---

1. The Site is known as the "Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund (National Priorities List) Site."

2. Benteler sued the prior owners of the facility and the cleaning company that damaged the transformer for the response costs. That suit has settled.

genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548. Thus, in evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* Nevertheless, Plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* at 586, 106 S.Ct. 1348. The mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. *See generally, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476–80 (6th Cir.1989).

KRSG has filed an 8–count complaint claiming a right to (I) recovery of response costs under CERCLA § 107(a), (II) contribution under CERCLA §§ 113(f) and 107(a)(3), (III) declaratory judgment of CERCLA liability under CERCLA § 113(g)(2), (IV) contribution under federal common law, (V) recovery of response costs under NREPA § 20126, (VI) contribution under NREPA § 20129, (VII) contribution under joint tortfeasors act, M.C.L. § 600.2925a, et seq. and (VIII) reimbursement under common law unjust enrichment.

Benteler and KRSG are in agreement that in order to hold Benteler liable for response costs the KRSG has incurred and will incur at the Site, KRSG must establish:

1. There was a release or threatened release of a hazardous substance;

2. The site of the release or threatened release is a "facility" as that term is defined in the statute;

3. The release or threatened release has caused KRSG to incur response costs; and

4. Benteler is among the statutorily-defined group of persons, which includes the owner or operator of a facility.

*See* CERCLA Section 107, 42 U.S.C. § 9607; *Thomas v. FAG Bearings Corp.,* 846 F.Supp. 1382, 1386 (W.D.Mo.1994).

█ Benteler only challenges KRSG's ability to demonstrate the third element: i.e., whether PCBs from Benteler's property contributed to the contamination of the Site. Like *FAG Bearings,* this a "two-site" case: the alleged release took place at a different site than where the contamination was found. 846 F.Supp. at 1387. In cases such as this, there must be a causal link between the contamination and the response costs incurred in cleaning it up. *Id.* 1390.

This causation requirement is an essential element of all of KRSG's claims against Benteler. KRSG's claims for reimbursement, contribution and unjust enrichment, whether under CERCLA, NREPA or common law, require, at a minimum, proof of causation, i.e. that Defendant Benteler's release of PCBs caused KRSG to incur response costs at the Site.

KRSG contends that Benteler is liable for response costs because PCBs have been discharged from a drainage ditch on Benteler's property to the Site and have caused the KRSG to incur response costs. KRSG's theory of causation is that as wastewater discharges from Benteler's operations and storm water runoff from its facility enter the ditch and travel downstream, the water picks up PCB-contaminated soils from the ditch and carries the soil and the PCBs to the Kalamazoo River and to the Site.

Benteler does not deny that there has been PCB contamination in the ditch during its ownership of the facility. Benteler contends in its motion for summary judgment, however, that the condition of the ditch and the soil are such that PCBs from its facility would not have migrated all the way down the ditch to the River. Benteler contends that any water running in the ditch would be absorbed into the soil before reaching the River. Benteler has offered a variety of evidence in support of this position.

The ditch was built in the 1950s. Approximately 430 feet south of the headwall there is an oil skimmer and a 4 foot concrete dam that was built in 1971. At the 2700 foot point there is an earthen mound barrier used by farmers for crossing the ditch. Beyond the barrier, the contour of the ' land surface slopes down towards Morrow Lake. The ditch flattens out and blends into the wet wooded area along the shore of the lake.

Benteler has presented evidence that the PCBs in Benteler's ditch were confined to the area near the headwall. The MDNR only required remediation activities in the ditch to a distance of approximately 600 feet from the headwall. Benteler was not required to remediate the remaining 2600 feet of the ditch because there were either no PCBs detected or no PCBs detected above the most stringent clean-up criteria. The soil studies from 1989, 1990, 1991 and 1993 revealed that the PCBs were concentrated from 0 to 300 feet from the headwall. The concentrations in this area were as high as 84 mg/kg. From 300–600 feet the highest concentration was 6.6 mg/kg. Beyond 600 feet the concentration of PCBs declined significantly. At 625 feet the concentration was 0.9 mg/kg. From 720 feet to 1250 feet the highest concentration was .112 mg/kg. At 1400, 1425, 1450, and 1596 feet there was no detection of PCBs.

Benteler conducted testing further down the ditch in 1996. Soil samples were taken at 1500, 2000, 2500 and 2700 feet from the headwall. No PCBs were detected at any of these locations with the exception of the 1500 foot point where there was a PCB reading of .43mg/kg. When the same sample from the 1500 foot point was retested, the result was non-detect.

To put the PCB levels in perspective, the Department's cleanup criteria developed pursuant to Michigan NREPA, M.C.L. § 324.20120a, is 21 mg/kg (21 ppm) for the industrial category and 2.3 mg/kg (2.3 ppm) for residential, the most stringent category.

Benteler has provided evidence that for the first 2700 feet of the ditch the groundwater level is 17–22 feet below ground level. Due to the depth of the water table and the permeability of the soil in this area, Bentel-

er's experts contend that any water discharged to the ditch during Benteler's ownership would have been absorbed within 600–800 feet of the headwall.

Benteler has presented evidence that the soil and vegetation in the ditch is not consistent with a continuous flowing stream, an intermittent stream, or even with occasional discharges of sufficient magnitude to carry water down the ditch to Morrow Lake.

Benteler has adequately demonstrated that any PCBs from its property would not have migrated down the ditch to Lake Morrow and the Kalamazoo River. Because Benteler has shown that Plaintiff cannot prove one element of its case (causation), the burden shifts to KRSG to present some evidence that there is a material issue of fact that Benteler Industries was in fact a source of PCB contamination in the Kalamazoo River. .

In response to the motion for summary judgment KRSG has submitted the affidavit of its expert, Mark Brown, Ph.D. Dr. Brown opines that "[a] logical interpretation of the facts leads to the conclusion that the ditch has discharged water and PCB to the Kalamazoo river and, therefore, PCBs from Benteler's facility are within the borders of the National Priorities List site." (Brown Affidavit, ¶ 4).

PCBs are soluble in water and therefore are picked up by and carried in water. Due to the presence of PCBs in the ditch during Benteler's ownership of the facility and based on my review of the facts and available data, stormwater and wastewater runoff into the ditch picked up PCBs from the ditch and carried them to Morrow Lake and to the Kalamazoo River. The PCB-containing wastewater and stormwater runoff from the ditch also has flowed beyond the lake into the Kalamazoo River and down the river to the Site.

(Brown Affidavit, ¶ 28).

Dr. Brown's conclusion that water in the ditch would have reached the Kalamazoo River is based upon four categories of information: the U.S. Geological Society Survey Map, stormwater discharge documents showing Morrow Lake as the discharge point for

the ditch, soil samples showing PCBs at 3 feet and 18 feet from Morrow Lake, and challenges to the conclusions of Benteler's experts.

■ The Court is not bound by the conclusions of experts. The Court may, indeed must, look beyond the conclusions to determine whether the expert testimony rests on a reliable foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, 485 (1993). *See also FAG Bearings,* 846 F.Supp. at 1394.

As a starting point Dr. Brown relies upon the USGS Survey Map's description of the ditch as a continuously running waterway. The map was originally created in 1961 with a photo revised date of 1985. There is no evidence to show that the map accurately reflects the conditions of the waterway since Benteler purchased the property in 1989. In fact, the evidence is uncontradicted that the ditch has *not* been a continuously running waterway since 1989.

Second, Dr. Brown contends that there are critical admissions in the record regarding the ditch which are now being disavowed by Benteler's current experts. Specifically, Dr. Brown relies on communications between MDNR and Benteler which recognized that Morrow Lake is the discharge point for the drainage ditch leaving the Benteler Property.[3]

KRSG contends that this evidence shows that Benteler and the MDNR have consistently recognized that wastewater and storm water runoff that enters the ditch is discharged to the Kalamazoo River. KRSG contends that the conflict between Benteler's current and previous positions is sufficient to create a genuine issue of fact and to preclude entry of summary judgment.

The Court disagrees. KRSG has overstated the evidence. Contrary to KRSG's assertions, there are no admissions by Benteler or any of its employees or experts that the ditch did in fact flow into the Kalamazoo River during Benteler's ownership of the property. The 1960 evidence predates the erection of the concrete dam and oil skimmer and predates Benteler's ownership of the facility by almost 30 years. In the documents since Benteler purchased the facility, Benteler and the MDNR speak only in terms of the possibility or risk of discharges reaching Morrow Lake. Benteler has not attempted to disavow its earlier statements. Benteler does not deny that the Kalamazoo River is a potential discharge point for the drainage ditch given sufficient water flow. KRSG, however, has not come forward with any evidence to contest Benteler's evidence that

---

3. Dr. Brown notes that in 1960 the Michigan Water Resources Commission wrote to General Signal's predecessor at the facility, New York Air Brake Co., stating that it observed oil on Morrow Lake that was traced to drainage from the plant.

In 1989 counsel for Benteler wrote the MDNR to oppose the issuance of a permit to General Signal to discharge treated groundwater to the ditch:

> The discharge of an additional 720,000 gallons per day of treated groundwater by General Signal to the ditch will increase the risk that PCB contaminants will be transported to the Kalamazoo River. As owner of the Property, this result could expose Benteler to liability under applicable environmental laws.

In a September 27, 1990, letter the MDNR directed Benteler to cease all discharges to the ditch. "This is due to the possibility that large stormwater flows could transport PCB's in the ditch to the Kalamazoo River." The MDNR's June 24, 1991, letter similarly recognizes the possibility of discharges to the ditch reaching Kalamazoo River:

> Benteler Industries must cease discharges to the ditch due to the possibility that contaminants could spread to the Kalamazoo River or spread the existing groundwater plume.

In January 1993, WW Engineering, Benteler's environmental consultant, prepared a draft Storm Water Discharge Permit Application for the MDNR which included the statement:

> MORROW LAKE (PART OF THE KALAMAZOO RIVER) IS THE DISCHARGE POINT FOR THE DRAINAGE DITCH LEAVING THE BENTELER PROPERTY.

In February 1993 WW Engineering issued a "Remedial Action Work Plan for the Storm Sewer Lines and On-Site Ditch" for Benteler. In that report WW Engineering noted as follows:

> As documented in the above referenced reports, sediments containing PCBs are present in the storm sewer and drainage ditch at the Benteler site.... Potential aquatic impacts would be somewhat limited due to the general low flow and intermittent nature of water in this ditch. In the future, contaminants in the drainage ditch could migrate further down the ditch into the adjacent impoundment of the Kalamazoo River. Such migration, if it were to occur, could present a potentially greater impact to the aquatic environment.

at least since Benteler's purchase of the Galesburg facility, the ditch has had physical barriers in it and combined with the porous ground and the low water table, neither wastewater nor storm water in the ditch has traveled all the way down to Morrow Lake.

Third, Dr. Brown relies on two soil samples taken by KRSG's experts, Blasland Bouck & Lee, in 1994. The samples, taken approximately 3200 feet from the headwall, showed PCBs of .43 mg/kg and .93 mg/kg at 3 feet and 18 feet from the shores of Morrow Lake. Dr. Brown contends that the fact that the concentration was lower nearer to the Lake supports the conclusion that the ditch was the source of the PCBs.

Dr. Brown's assessment is not well supported. It does not take into consideration the fact that Morrow Lake is known to be contaminated with PCBs at comparable levels and the shoreline of the lake in this area is a riverine wetland subject to flooding, factors which would more readily support the opposite conclusion that the lake was the source of the PCBs near the water's edge rather than the ditch. Moreover, because there is no evidence of PCBs between the 1500 foot mark and 18 feet from the lake, a distance of approximately 1700 feet, the lake is more probably the source of the PCBs. The southern portion of the ditch was not excavated during Benteler's remediation efforts. If PCBs came down the ditch to the lake there would be traces of PCBs in this 1700 foot stretch of the ditch. There is no such evidence. KRSG has not been able to connect the evidence of shoreline PCB contamination with PCB contamination farther up the ditch.

Finally, Dr. Brown attempts to discredit the opinions of Benteler's experts. Dr. Brown challenges Dr. Halfen's opinion on the basis that his soil samples were taken after the remediation of the ditch; he failed to consider the level of non-storm water discharges; he improperly attempted to write off the PCB finding at the 1500 foot mark as anomalous; he ignored the underestimating bias associated with his "composite" samples; and he failed to recognize that the lack of obligate hydrophytic plant species is not inconsistent with the function of the ditch as an intermittent stream and conveyance for stormwater from the facility to Morrow Lake.

Dr. Brown disputes Mr. Austin's calculations because they are based on insufficient waterflow. He contends that Austin underestimated the discharge rate, the rainfall, and the drainage area served by the ditch. He also contends that Austin improperly assumed that the runoff would be evenly distributed over a 24–hour period and that he failed to consider that the groundwater table will rise during periods of high runoff.

Dr. Halfen and Mr. Austin have responded to Dr. Brown's criticisms in supplemental affidavits. However, assuming Dr. Brown is correct in his criticisms of Plaintiff's experts, he has still failed to come forward with any affirmative evidence to support his conclusion that the water flow was in fact at sufficient levels after Benteler's purchase of the facility in 1989 to drain into Morrow Lake.

Dr. Brown's suggestion that rainfall could have been higher than estimated is based upon a reported rainfall in 1978, prior to Plaintiff's purchase of the facility. Dr. Brown's assertion that discharge was higher than estimated is based upon his assumption that a reported 50–100 gallons per minute non-stormwater discharge can be projected at a constant rate over a 24 hour period. Although Dr. Brown criticizes Austin's failure to consider runoff from the fields along the length of the ditch, he does not come forward with any evidence of what the runoff would be. While asserting that the plant life in the ditch does not preclude an intermittent water flow in the ditch, Dr. Brown does not deny that the plant life is also consistent with Benteler's conclusion that there was no water flow down the ditch to Morrow Lake.

■ Although Dr. Brown argues that Plaintiff's estimate of water flow is too low, he has no facts to show that the discharge into the ditch was ever high enough during Benteler's ownership of the facility to achieve sufficient flow to the river. By challenging Benteler's experts, KRSG has created, at most, a question of fact as to whether or not there was a *possibility* that water flowed all the way down the drain to Morrow Lake. His

opinion is based upon speculation, conjecture, and possibility. "[O]pinions about causation on a particular site must be supported by some factual basis to remove them from the realm of impermissible speculation." *FAG Bearings,* 846 ·F.Supp. at 1394. The inadequate factual basis makes Dr. Brown's affidavit scientifically unreliable.

■ KRSG's entire theory of liability on behalf of Benteler is based upon the assumption that water flowed down the ditch to Morrow Lake. This assumption, however, is based solely on speculation and possibility. The existence of a possibility does not create a material issue of fact for trial because KRSG bears the burden of proof to show that Benteler *did* contribute to PCBs in the Kalamazoo River, not that it is possible that it might have contributed to the PCBs.

> The plaintiff must present more than a mere scintilla of evidence in support of [his] position; the plaintiff must present evidence on which the jury could reasonably find for the plaintiff. . . . . The mere possibility of a factual dispute is not enough.

*Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citations and internal quotations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997).

KRSG has utterly failed to come forward with any evidence that would tend to show that water did in fact flow down the ditch in sufficient quantity to carry PCBs from the northern part of the ditch to Morrow Lake. KRSG has not shown the existence of any PCBs between the 1500 foot point on the ditch and the point 18 feet from the lake's edge. Because KRSG has not connected the dots to show a flow of PCBs from the Benteler facility, Benteler is entitled to summary judgment.

## IV.

KRSG has filed a conditional motion for extension of time to respond to Benteler's motion for summary judgment. Under the Case Management Order issued in this case, expert witness reports were not due until March 1, 1997. KRSG contends that its experts have not had sufficient time to complete their analyses and reports in support of KRSG's claim against Benteler. Accordingly, if the Court does not deny Benteler's motion based on KRSG's brief in opposition, KRSG requests the Court to continue consideration of Benteler's motion until March 1, 1997, pursuant to Rule 56(f).

■ A party does not have an unconditional right to complete discovery prior to entry of summary judgment. *Emmons v. McLaughlin,* 874 F.2d 351, 356 (6th Cir. 1989). Rule 56(b) provides that a defendant may move for summary judgment "at any time." If a party is unable to present by affidavit the facts essential to its opposition, it is required under Rule 56(f) to submit an affidavit setting forth the reasons why it cannot present by affidavit the facts essential to justify its opposition to the motion for summary judgment.[4] A party invoking the protections of Rule 56(f)

> must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits as otherwise required by Rule 56(e) and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.

*Emmons,* 874 F.2d at 356–57. Additional time for discovery is not warranted unless the party requesting delay can show that it has not had the opportunity to discovery information essential to opposition. *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 893 (6th Cir.1991).

■ KRSG has not complied with the requirements of Rule 56(f). It has not submitted any affidavits setting forth why it cannot oppose Benteler's motion for summary judgment or how postponement will enable it to show the existence of a genuine issue of

---

4. Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify that party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

material fact. Neither has KRSG identified in its motion, brief, or at oral argument, the nature of the additional facts it needs in order to oppose Benteler's motion. While counsel for KRSG has stated generally that KRSG would like time to analyze Benteler's experts' documents and to depose Benteler's experts, KRSG has not identified what it hopes to accomplish through such depositions. It has not identified any affirmative evidence it will be able to come forward with to show that Benteler is responsible for PCBs in the Kalamazoo River. KRSG has the burden of proof on the issue of Benteler's liability. KRSG has been investigating this issue since at least 1992 and has had more than adequate opportunity for discovery. Because KRSG still cannot identify what specific facts it intends to establish through further discovery to create an issue of fact as to Benteler's liability, KRSG's motion for extension of time will be denied.

## V.

Defendant Benteler has filed a counterclaim against Plaintiff KRSG. That counterclaim is premised upon a finding of liability against Benteler. In light of this Court's determination that Benteler is not liable for response costs at the Site, Benteler's counterclaim against Plaintiff for contribution is moot and will be dismissed.

An order consistent with this opinion will be entered.

### ORDER AND JUDGMENT AS TO DEFENDANT BENTELER INDUSTRIES, INC.

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Defendant Benteler Industries, Inc.'s motion for summary judgment (Docket # 156) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff Kalamazoo River Study Group's conditional motion for extension of time to respond to Benteler Industries, Inc.'s motion for summary judgment (Docket # 185) is **DENIED.**

**IT IS FURTHER ORDERED** that a **JUDGMENT** of no cause of action is entered as to Plaintiff's claims against Defendant Benteler.

**IT IS FURTHER ORDERED** that Defendant Benteler's counterclaim against Plaintiff KRSG (Docket # 165) is **DISMISSED.**